# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

___

| UNITED STATES OF AMERICA, | Court File No. 19-cr-281 (SRN) |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT'S POSITION ON SENTENCING** |
| JOSE MARTIN MORALES, | |
| Defendant. | |

___

The Defendant, Jose Martin Morales, respectfully submits the following memorandum as his position regarding sentencing. Morales was taken into federal custody on October 8, 2019 and remains in the Sherburne County Jail awaiting sentencing.

Morales faces a potentially mandatory sentence of 15 years. He plead guilty to Count 2 of the Indictment, which charges possession with intent to distribute 50 grams or more of methamphetamine (actual) or 500 grams or more of a mixture containing methamphetamine pursuant to 21 U.S.C. §841 (b)(1)(A). This count carries a mandatory minimum 10 year sentence. On November 27, 2019 the Government filed an information to establish a prior conviction pursuant to 21 U.S.C. §851. The information alleges Morales' 2007 conviction for 1st Degree Assault (Aid/Abet) in Minnesota is a serious violent felony, triggering a mandatory minimum 15 year sentence.

Morales challenges the §851 notice, but he does not seek a jury on the issue. The primary issue for the Court at sentencing is whether the prior conviction should count as

a serious violent felony.  The PSR recommends an advisory guideline range of 135-168 months based on total offense level 31 and criminal history category III.  However, if the §851 notice applies, the sentence would be 180 months.  Morales argues his advisory guideline range should be much lower, but acknowledges the mandatory minimum of 10 years.

## BACKGROUND AND FACTS

Jose Morales was born in Fresno, California.  He moved to Minnesota when he was 8 years old because his parents sought better employment.  He and his family stayed in Minnesota and they remain here today.  Morales' childhood was uneventful and he had a good upbringing.  His biggest challenge in life was how he managed an ADHD diagnosis while he was in school in California.  The description of what his school day looked like leads Counsel to believe Morales' ADHD was symptoms were significant.  He was placed on medication and his school implemented accommodations for him.  By way of example, Morales would come home at lunchtime rather than stay until the end of the day because his disruptive behavior would increase while his attention would decrease.

When Morales' family moved to Minneapolis, his new school allowed Morales to translate for his parents during an intake meeting.  He claims he denied having ADHD and said nothing about medication.  His motivation was he wanted to have a full school day like the other kids and he wanted to get recess.  Morales wanted to fit in with his new classmates.  Over time, this ploy would not serve him well as he struggled in school.

In hearing this story, Counsel was skeptical about how Morales would be allowed to translate for his parents and just deny having ADHD like it was some mistake.  The

school staff in Minneapolis would presumably obtain some records from California. The need for intervention would be apparent at some point. However, in discussing this scenario with educators in the area of special education, it is possible Morales' tale is not altogether misinformed. It can be analyzed as a tale of two kids: one, a suburban kid with ADHD in an affluent school district. The second, an Hispanic kid with ADHD transferring in to a more urban school district. The suburban kid likely receives special education services, classroom accommodation, the assistance of a paraprofessional, and learns about his zones of regulation. He gets several chances to get it right before there are more severe consequences. The second kid is sent home at noon because that is about when his day starts to get tough. And now, in a new school, there are no supports in place to help him because of Morales' misguided ploy. It was possible years ago that Morales' Spanish-speaking parents were not as engaged in his schooling or his medical appointments for medication.

Eventually, Morales had trouble with school and he responded by skipping class. He did not get medication and he never learned his zones of regulation. He never learned how to deal with his ADHD, impulse control, or decision making. Morales began spending time on the streets and associating with criminal activity. This is how a person like Morales comes from a good family and inexplicably gets into trouble. If you ask him, Morales will say there is no one to blame for his problems, but himself. He doesn't make excuses and he doesn't blame some school district for letting him down. Nonetheless, the criminal justice system is now the means by which Morales must figure out his life because he never acquired better coping mechanisms when he was young.

Morales did the best he could to fit in with his peers, which lead to trouble. He spent much of his formative years in prison because of the 2007 assault conviction. Morales' guilty plea in that case was based on his involvement more as an aider and abettor rather than an instigator of the conduct. This is not meant to minimize the seriousness of that offense, or his role resulted in the injuries suffered by the victim. Morales was a juvenile when he was charged. His youth and lack of ways to cope with his impulsivity made him a person easily persuaded into aiding and abetting such a horrible crime.

When he was released from prison, Morales found ways to earn money and care for his young family. He admits he made small amounts of money selling meth, but he never intended for drug sales to be his primary source of income. Morales wants the Court to know all he really wants in life is to be a family man. Counsel would add what Morales means to say is his ideal life involves spending time with his wife and kids rather than setting up drug deals. The fact his actions did not line up with his goals causes Morales a deep and abiding feeling of remorse.

Morales seeks a sentence of no more than the mandatory minimum of 120 months. He contests the application of the §851 notice to his case, and asks the Court to find his prior conviction should not be used to enhance his sentence.

## ARGUMENT

Morales argues his sentence should be no more than 120 months based on several factors and without applying the §851 notice. Just a few years ago, this sentencing request would be an easier argument because the §851 notice could not include an assault

conviction as a predicate offense under the previous version of the law. Morales claims his prior conviction is distinguishable from other prior serious violent felonies because he was accused of aiding and abetting in his offense. Further, Morales argues §851 notices are arbitrarily used by the Department of Justice to guarantee longer sentences for offenders the Department identifies as targets for particularly harsh sentences.

The beginning point for any sentencing consideration in federal court is establishing the advisory guideline range. The only remaining objections to the PSR are: 1) whether the Court will recognize the disparity in guideline application between actual and mix methamphetamine and adjust the guideline calculation; and, 2) whether the §851 notice will be applied. Morales presents his argument regarding the disparity between actual and mix guidelines as a variance request.

The sentencing methodology as outlined by Eighth Circuit caselaw is as follows:

> The district court should begin "by correctly calculating the applicable Guidelines range." "[T]he Guidelines should be the starting point and the initial benchmark, but the Guidelines are not the only consideration." The district judge should allow "both parties an opportunity to argue for whatever sentence they deem appropriate," and then should consider all of the §3553 (a) factors to determine whether they support the sentence requested by a party."
> *United States v. Hill*, 552 F.3d 686, 691 (8th Cir. 2009) (quoting *Gall v. United States*, 552 U.S. 38, 49-50, 128 S.Ct. 586 (2007)).

The courts should "continue to engage in the three-step process of first ascertaining the applicable Guidelines range, then considering any permissible departures within the Guidelines's structure, and finally, deciding whether a non-Guidelines sentence would be more appropriate under the circumstances pursuant to §3553 (a). *United States v. Washington*, 515 F.3d 861, 866 (8th Cir. 2008).

In the instant matter, Morales asks the Court to consider a variance to a sentence no more than 120 months. A district court has an independent obligation to exercise its discretion to craft a sentence that is sufficient, but not greater than necessary, to achieve the goals of §3553 (a). *Freeman v. United States*, 564 U.S. 522 , 131 S.Ct. 2685, 2692 (2011). This is a reference from *Gall*, which goes on to state: "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. *Gall*, at 522.

## VARIANCE FOR DISPARITY IN METH SENTENCING

Morales accepts the advisory guideline range in the PSR as an accurate calculation, but argues for variance on grounds that the PSR range fails to recognize the disparity between guidelines for actual versus mix methamphetamine. The variance is based on a policy disagreement with the guideline application to methamphetamine cases and to avoid a sentencing disparity pursuant to 18 U.S.C. §3553 (a)(6).

The issue of sentencing disparity between actual versus mix methamphetamine has been briefed and argued several times in this district. Judges in this district have in several cases found there is a policy disagreement with the methamphetamine guidelines and granted a variance based on application of the §3553 (a) factors. *see U.S. v. Heisler*, 18-cr-115 (PJS).

District courts may impose sentences that vary from the guidelines based on a policy disagreement with specific guideline sections. *Spears v. United States*, 555 U.S. 261, 267 (2009); *Kimbrough v. United States*, 552 U.S. 85, 101-102 (2007); *Rita v. United States*, 551 U.S. 338, 351 (2007). "[A] variance based on a policy disagreement is particularly appropriate when the Guidelines range results in sentences greater than necessary to achieve sentencing objectives and the Guidelines are not based on empirical data and national experience, but on statutory directives." *United States v. Nawanna*, 321 F. Supp. 3d 943 (N.D. Iowa 2018); *citing United States v. Hayes*, 948 F.Supp.2d 1009, 1027, 1031 (N.D. Iowa 2013) (Bennett, J.) (explaining that the methamphetamine Guidelines are not the result of empirical data and national experience, but statutory directives); *Kimbrough*, 552 U.S. at 96; *Gall v. United States*, 552 U.S. 38, 46 n.2 (2007)).

The history of the development of the guidelines for methamphetamine sheds light on the problem today. In 1987, the guidelines first included a comment regarding how to handle the question of purity. U.S.S.G. §2D1.1 (1987) treated 1.5 kg of methamphetamine as the equivalent to 600 kg of marijuana. The drug quantity table did not have different entries for actual versus pure methamphetamine. see U.S.S.G. §2D1.1 (1987). According to comment 9 to §2D1.1, the purity of the controlled substance may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution. Morales claims this rationale is clearly no longer relevant. Everyone in the meth trade has product close to full purity regardless of their role in a drug trafficking organization. And, the evidence in the instant matter shows

Morales is a relatively low level dealer in comparison to present cases pending in this district.

Congress first established mandatory minimum sentences for methamphetamine offense in 1988. *see* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, §647 (g)-(h), 102 Stat. 4181, 4378 (codified at 18 U.S.C. §841(b)(1)). Under this amendment to the law, the mandatory minimums carried a 10:1 ratio based on purity. In 1989, the Commission revised the drug quantity table found in §2D1.1 and included the statutory penalties as well as differentiating between actual to pure methamphetamine at the 10:1 ratio. As Judge Tunheim pointed out in *U.S. v. Ferguson*, 17-cr-204 (JRT/BRT) the 1989 guidelines treated 15 kg of meth mixture and 1.5 kg of actual/pure meth as each equivalent to 15,000 kg of marijuana.

Again, in 1998, Congress amended the statutory penalties for methamphetamine offenses and cut the amounts needed to trigger mandatory minimum sentences in half. *see* Methamphetamine Trafficking Penalty Enhancement of 1998, Div. E, §2, Pub. L. No. 105-277, 112 Stat. 2681, 2681-759. The Commission responded to Congress by increasing the base offense levels for methamphetamine. U.S.S.G. §2D1.1(c)(4), (7) (2000). The judges who have analyzed this issue generally agree a person in criminal history category I faces guidelines ranges commensurate with mandatory minimums in every case. Example:

    50g meth mix or 5g actual/pure meth = 5 year minimum

    50g meth mix or 5g actual/pure meth = base offense level 24 (51-63 mos.)

    *cf.* 21 U.S.C. §841 (b)(1)(B)(viii) (2018); U.S.S.G. §2D1.1 (c)(8) (2018).

    500g meth mix or 50g actual/pure meth = 10 year minimum

    500g meth mix or 50g actual/pure meth = base offense level 30 (97-121) cf. 21 U.S.C. §841 (b)(1)(A)(viii) (2018); U.S.S.G. §2D1.1 (c)(5) (2018)

  The Commission twice amended the guidelines for methamphetamine offenses to make base offense levels with criminal history category I coincide with mandatory minimum sentences on the heels of Congressional amendments. This is a problem because the Sentencing Commission departed from the empirical approach when setting the guidelines range for drug offenses, and chose instead to key the guidelines to the statutory mandatory minimum sentences that Congress established for such crimes. *see Ferguson*, p.3; *Gall v. U.S.*, 552 U.S. 38, 46 n.2 (2007).

  The Sentencing Reform Act of 1984, a chapter within the larger Comprehensive Crime Control Act of 1984, created the Sentencing Commission. See Pub. L. 98-473, 98 Stat. 2068. The Sentencing Reform Act directed the Sentencing Commission to enact sentencing guidelines that would meet the purposes of sentencing found in §3553 (a)(2), provide fairness, reduce unwarranted disparities, maintain sufficient flexibility to permit individualized sentences, and reflect the advancement in knowledge of human behavior. s*ee* Pub. L. 98-473, §§217, 239, 98 Stat. 1987 (1984). The Commission is expected to develop ways to measure the effectiveness of the guidelines and it has extensive research powers. *Id.*

  Since the guidelines were introduced, the Commission has modified and amended various guidelines on many occasions. The Commission gathers data, regularly reviews PSRs and sentences from around the country, and presents reports to Congress.

Ostensibly, these reports, based on extensive research, are used by Congress to consider possible changes to the guidelines. In practice, this is not what happened with §2D1.1 and now Morales asks the Court to disregard the guideline on policy grounds that it creates unwarranted sentencing disparities and fails to meet the goals of federal sentencing. The 10:1 ratio no longer makes any sense and the purity as proxy approach also no longer works. As many courts have concluded, almost every case involving methamphetamine has purity levels of well over 90%. The distinction between mix and actual/pure is obliterated. Drug cartel operatives and end users on the street all have the same access to the same highly pure drugs. The proper remedy for this problem is to use the lower base offense levels for meth mix in the context of a variance.

      Morales argues the Court should not consider the advisory guideline range in the PSR as reasonable. The Supreme Court provides authority for this position: "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guideline range is reasonable." *Nelson v. United States*, 555 U.S. 350, 129 S.Ct. 890, 892 (2009). The Guidelines are not only not mandatory on sentencing courts; they are not to be presumed reasonable. *Nelson*, 129 S.Ct. at 892. In the instant case, the Court has discretion to grant a significant variance from the guideline range.

      Morales asks the Court to find his base offense level should be no more than level 30 based on the amounts from the controlled buys in September, 2019. U.S.S.G. §2D1.1 (c)(2) reflects a base offense level of 30 for 500g but less than 1.5 kg of methamphetamine. With reductions for acceptance of responsibility, his guideline range would be level 27 in criminal history category III. The range is 87-108 months, well below the 120 month

minimum sentence.  Morales argues this variance matters because the PSR recommendation places him in a range of 135-168 months, well above the 120 month minimum.

## §3553 (a) FACTORS

The sentencing factors in 18 U.S.C. §3553(a) support a sentence of 120 months in several respects.  Morales argues his history and characteristics mitigate his current position rather than provide grounds for an aggravated sentence.  Morales claims his involvement in the 2007 assault was the product of youthful ignorance and recklessness.  He spent years incarcerated, into his twenties, while others his age furthered their education, raised families, or started work careers.  Since then, Morales has shown himself to not be a violent person.  The Government continually characterizes Morales as a gang member that presents a danger to society.  Morales denies being engaged in gang activity and comes before the Court desperately seeking an opportunity to be present for his family while his kids are young.

Morales informs Counsel he seeks treatment programs and wants to address any underlying mental health issues he never confronted in the past.  The sentence the Court imposes should take into account the need for Morales to get needed programming rather than just a long sentence.  He is hopeful he can avoid B.O.P. designation to a U.S.P. facility.  Instead, with a manageable sentence, he can remain close to his family in Minnesota in a lower security facility.

A sentence of 120 months is a significant amount of time that promotes respect for the law and provides more than adequate or just punishment for selling methamphetamine.

## §851 NOTICE - ENHANCED SENTENCE

The Government filed its notice pursuant to 21 U.S.C. §851 alleging Morales' prior conviction for 1st Degree Assault (aid/abet) in 2007 is the basis for enhanced sentence. With a simple keystroke on a computer, the U.S. Attorney's Office imposed an additional five years of prison on Morales with little recourse to challenge it.

In 2013, the Hon. Mark Bennett wrote a memorandum opinion in a drug case from the Northern District of Iowa that severely criticized the arbitrary nature of §851 notices in that district. s*ee U.S. v. Young*, 960 F.Supp.2d 881 (N.D. Iowa 2013). Prior to August, 2013 the Department of Justice lacked any discernible policy on the use of §851 notices. Just days before the Young opinion was filed, then U.S. Attorney General Eric Holder issued a memorandum to all U.S. Attorney offices that created a national policy on seeking enhanced sentence. *Young*, at 888. The policy directed AUSAs to consider certain factors before filing §851 notices that were meant to make use of the notice less disparate. *Id*.

During the Trump administration, the policy put forth by AG Holder was abandoned as evidenced by a memo dated May 10, 2017.[1] Now, it was department policy to pursue the most serious offenses, which were defined as those offenses carrying

---

[1] Dept. Charging and Sentencing Policy, www.justice.gov/archives/opa/press-release/file/965896/download

the most substantial guidelines sentences. Morales' crimes occurred, and were charged, in 2019 while the Holder policy was no longer effective and the Trump policy was in place. On January 29, 2021 the acting Attorney General issued a new memorandum that rescinded the Trump-era policy, thus reverting to prior policy on charging decisions. The Holder policy might not have prevented the §851 notice in Morales' case, but it could have made it less likely. Morales claims enhanced sentencing notices filed under the direction of seeking the most substantial guideline sentence in every case is inherently unjust. He further argues the Court should reject the notice because it does not properly describe the conduct from the prior offense in the context of the definition of serious violent felony.

The §851 notice in the instant case refers to a First Degree Assault conviction from 2007. It does not state Morales was charged with aiding and abetting in the crime. Morales argues the difference is in the comparative culpability of his actions.

According to 21 U.S.C. §841 (b)(1)(A), "if any person commits such a violation after a prior conviction for a serious drug felony or serious violent felony has become final, such person shall be sentenced to a term of imprisonment of not less than 15 years…." The term "serious violent felony" is found in 21 U.S.C. §802 (58) and is defined therein as "an offense described in §3559 (c)(2) of Title 18 for which the offender served a term of imprisonment of more than 12 months; and any offense that would be a felony violation of section 113 of Title 18, if the offense were committed in the special maritime and territorial jurisdiction of the United States, for which the offender served a term of imprisonment of more than 12 months." Morales was sentenced to 129 months in 2007.

According to 18 U.S.C. §3559 (c)(2)(F)(i), the list of offenses does not include the type of assault in Morales' conviction. Under §3559 (c)(2)(F)(ii), the term "serious violent felony" means "any other offense punishable by a maximum term of imprisonment of 10 years or more that has an element the use, attempted use, or threatened use of physical force against the person of another or that, by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense." These definitions are broad, but also not consistent.

The elements of First Degree Assault in Minnesota require a defendant assaulted another and caused great bodily harm. *See* Minn. CRIMJIG 13.04 (2020). However, the State is not required to prove a defendant intended to inflict great bodily harm, just that the defendant intended to commit assault. *Id.* Assault is defined at trial as "an act done with the intent to cause fear in another of immediate bodily harm or death; or intentional infliction of or attempt to inflict bodily harm upon another. *See* Minn. CRIMJIG 13.01 (2020). Morales' criminal history admittedly reflects that he was convicted of First Degree Assault in 2007, but his actual role in the offense is unclear.

In Minnesota, a person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime. Minn. Stat. §609.05, Subd. 1 (2020). Morales has always maintained that as a 17 year old kid pressured by older principals he feared to participate in the assault, that he was somewhat less culpable than those principals. He now argues a terrible crime from 14 years ago that happened when he was a kid should not come back to enhance a drug sentence.

In all fairness, Counsel for Morales acknowledges the Eighth Circuit has already found there is no distinction between a conviction as a principal and a conviction for aiding and abetting in the context of defining "crime of violence" for career offender purposes. *U.S. v. Gammell*, 932 F.3d 1175, 1180 (8th Cir. 2019). Morales argues his case is different because the statutes defining "serious violent felony" are inconsistent and they are very broad. He seeks a finding from the Court that even if the Government can prove he has a prior conviction that appears to be a serious violent felony, the Court should still reject the enhanced sentence because of his role in the former offense and in the interest of justice.

## CONCLUSION

Jose Morales seeks a sentence of no more than 120 months in light of his variance request and challenge to the §851 notice.

BEITO & LENGELING, P.A.

Date:__May 11, 2021_____     By _____*s/ Robert A. Lengeling*_____
                                        Robert A. Lengeling, #304165
                                        Flour Exchange Building
                                        310 Fourth Avenue South, Suite 1050
                                        Minneapolis, Minnesota 55415
                                        (612) 767-1618 / (612) 333-8003 fax
                                        rob@beitolengelinglaw.com
                                        ATTORNEY FOR DEFENDANT